William T. THIGPEN, Jr., and James W. Allen, Plaintiffs-Appellants,

v.

BIBB COUNTY, GEORGIA, Sheriff's Department;  and Robbie Johnson, Sheriff, Bibb County, Georgia, in his official capacity, Defendants-Appellees.

No. 99-12417.

United States Court of Appeals,

Eleventh Circuit.

July 7, 2000.

Appeal from the United States District Court for the Middle District of Georgia.(96-00315-CV-5-2-WDO), Wilbur D. Owens, Jr., Judge.

Before TJOFLAT, MARCUS and KRAVITCH, Circuit Judges.

KRAVITCH, Circuit Judge:

This appeal centers around the challenge of two white police officers to the continued constitutionality of an employment promotion policy adopted in settlement of a prior racial discrimination suit against the Bibb County, Georgia, Sheriff's Department (the "Department").  The officers claim that the promotion policy's mandate that the Department award fifty percent of all annual promotions to black officers denies them the opportunity to compete for those promotions and thus violates their right to equal protection of the laws as guaranteed by the Fourteenth Amendment to the United States Constitution.[1]

The appeal presents four distinct legal questions:  (1) whether an equal protection claim alleging racial accounting in the conferral of promotions is cognizable;  (2) whether an equal protection claim brought pursuant to 42 U.S.C. § 1983 ("section 1983") is viable absent a companion racial discrimination claim brought pursuant to the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e ("Title VII");  (3) whether the burden-shifting analysis familiar to employment discrimination claims is applicable to these officers' equal

---

[1]"No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States;  nor shall any State deprive any person of life, liberty, or property, without due process of law;  nor deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.

protection claims; and (4) whether the several denied promotions underpinning the officers' equal protection claims constitute a single "continuing violation" of the Fourteenth Amendment's equal protection clause for statute of limitations purposes. We answer the former two questions in the affirmative and the latter two in the negative.

## I. BACKGROUND AND PROCEDURAL HISTORY

In 1978, James Reeves, a black male employed as a deputy sheriff by the Department, on behalf of all past, present, and future black applicants for employment with or promotions within the Department, commenced a class action racial discrimination suit against the Department and former Sheriff Raymond Wilkes. In settlement of that litigation, the parties entered into, and the district court ratified, a Consent Decree (the "*Reeves* Decree"), which in part provided:

PART VIII—AFFIRMATIVE ACTION—PROMOTION GOALS

12. A part of the objective of this Order is to achieve a work force in which the promotion of black employees, is equal, (a) by job classification, (b) by department, and (c) by rate of pay. In furtherance of this promotion goal, during the term of this Order the Defendants shall adopt the promotion goals referred to below:

a. All personnel in the Sheriff's Department will be made aware of the requirements for promotion to their next highest position.

b. At least semi-annually personnel eligible for promotion will be notified.

c. *Each year at least fifty percent (50%) of the promotions will be blacks who have met the requirements for promotion to their next highest position.*

d. This system is to be followed until the Court shall determine that the Defendants have complied in good faith with this Order and the requirements of federal laws relating to employment practices.

...

14. Anything herein notwithstanding, Defendants shall not be required to violate Title VII or any other laws mandating equal employment opportunity in the implementation of this section of the Decree.[2]

---

[2]*Reeves v. Wilkes,* Civ. Action No. 78-61-MAC (M.D.Ga. Jun. 18, 1979) (memorializing and approving the Consent Decree) (emphasis added), *in* R2, Tab 94, Ex. D.

Despite the former Sheriff's efforts to modify or dissolve the *Reeves* Decree and a failed attempt by white police officers to intervene in the original *Reeves* suit, *see generally Reeves v. Wilkes,* 754 F.2d 965 (11th Cir.1985) (rejecting the motion to intervene as untimely), the *Reeves* Decree continues to operate. The Department professes complete compliance with the requirements of the *Reeves* Decree since its inception.

Plaintiffs-Appellants William Thigpen, Jr., and James Allen (collectively, "Plaintiffs"), both white males, are police officers in the Department and hold the respective ranks of Captain and Senior Lieutenant. Pursuant to 42 U.S.C. § 1983, Plaintiffs brought the instant action against the Department and Sheriff Johnson in his official capacity (collectively, "Defendants")[3] to challenge the constitutionality of the continued implementation of the *Reeves* Decree. Plaintiffs allege that continued adherence to the terms of the *Reeves* Decree unconstitutionally apportions the Department's annual promotions on the basis of race, excluding them from competing for one-half of the promotions conferred annually and precipitating the promotion of less-qualified black applicants. Plaintiffs enumerate a total of seven promotions conferred on black officers for which either one or both of them allegedly were not considered because of their race: Plaintiff Thigpen assails the promotions of Robert White in 1990, Leonard Thomas in 1992, and Charles Gantt in 1996 to the rank of Major,[4] the next highest rank above his present rank of Captain; in addition to these promotions, Plaintiff Allen assails the promotions of James Reeves in 1986, Robert White in 1989, Leonard Thomas in 1990, and Stella Davis in 1992 to the rank of Captain, the next highest rank above his present rank of Senior Lieutenant. Of these, Defendant Sheriff Johnson conferred only the 1996 promotion of Gantt to the rank of Captain; all others were conferred by former Sheriff Wilkes.

---

[3]In addition to these defendants, Plaintiffs originally also named Bibb County and its County Commissioners in their official capacities. The district court ordered the dismissal of these parties as defendants, and Plaintiffs do not appeal that decision.

[4]Unlike the other officers promoted to Major, Gantt was promoted two ranks, from Senior Lieutenant to Major, skipping the rank of Captain.

Defendants moved for summary judgment;  Plaintiffs responded by moving for partial summary judgment on liability, that is, whether the *Reeves* Decree is dispositive evidence of racial apportionment and discrimination.  The district court granted Defendants' and denied Plaintiffs' respective motions.  This appeal followed.

## II. ANALYSIS

The district court articulated four reasons for granting Defendants' motion for summary judgment. First, it interpreted this circuit's law to require a plaintiff alleging an equal protection violation to demonstrate a property or liberty interest in the opportunity or benefit denied him or her.  Because Plaintiffs' claims are premised on allegedly improper denials of promotions, in which no property or liberty interest exists, the court held that Plaintiffs' claims are not cognizable.  Second, the court held that Plaintiffs' failure to file companion employment discrimination claims under Title VII procedurally precludes their section 1983 claims.  Third, applying the burden-shifting analysis familiar to employment discrimination claims, the court held that Plaintiffs introduced insufficient evidence to create a genuine issue of material fact as to whether Defendants' non-discriminatory explanations for their decisions not to promote Plaintiffs were pretextual. Fourth, because all promotions other than that of Gantt in 1996 were conferred outside of the two-year statute of limitations, the court held that Plaintiffs' claims, to the extent that they are premised on those earlier promotions, are time barred.  On appeal, Plaintiffs assign error to each of the district court's holdings, as well as to its denial of their cross-motion for partial summary judgment.  We review the district court's disposition of summary judgment motions and any conclusions of law drawn therein *de novo.  See Kirby v. Siegelman,* 195 F.3d 1285, 1289 (11th Cir.1999).

*A.      The Relevancy of Property or Liberty Interests to Equal Protection Claims*

We address first the district court's conclusion that Plaintiffs' equal protection claims are incognizable because Plaintiffs had no property or liberty interest in the promotions they were denied.  In reaching its holding, the district court relied on this court's decision in *Wu v. Thomas,* 847 F.2d 1480, 1485 (11th

**4**

Cir.1988), in which we reaffirmed that "a prospective promotion is not a property or liberty interest protected by the fourteenth amendment" and accordingly dismissed the plaintiff's section 1983 claim as meritless. The district court relied on this passage from *Wu* out of context, however. The plaintiff in *Wu,* after repeatedly being denied promotion to a full professorship at a state institution, alleged violations of both her equal protection and due process rights. *See id.* We recognize that the *Wu* court's discourse concerning these two claims does not demarcate with clarity the analysis appropriate to each claim, but we nonetheless are able to disaggregate the court's reasoning. In the passage quoted, the court was disposing only of the plaintiff's due process claim. *See id.* Later in the same paragraph, the court separately considered the plaintiff's equal protection claim; although the court also deemed this claim meritless, its conclusion was founded not on the plaintiff's lack of a property or liberty interest in the promotions denied her, but rather on the plaintiff's failure to introduce evidence suggesting a discriminatory motive underlying the denials. *See id.*

The district court's identification of a property or liberty interest as a required element in an equal protection claim is erroneous because the text of the Fourteenth Amendment demonstrates that property and liberty interests are irrelevant to equal protection claims. Of the three clauses included in the second sentence of the Amendment's first section—the privileges and immunities clause, the due process clause, and the equal protection clause—only the due process clause alludes to "property" and "liberty." *See* U.S. Const. amend. XIV, § 1; *cf. Board of Regents v. Roth,* 408 U.S. 564, 569-78, 92 S.Ct. 2706-10, 33 L.Ed. 2d 548 (1972) (discussing generally *the due process clause's* safeguard of property and liberty interests). In contrast, the applicability of the equal protection clause is not limited to only those instances in which property and liberty interests are implicated. *See* U.S. Const. amend. XIV, § 1. Rather, to properly plead an equal protection claim, a plaintiff need only allege that through state action, similarly situated persons have been treated disparately. *Cf. City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985); *Plyler v. Doe,* 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982). The gravamen of Plaintiffs' complaints is that although all officers holding equal rank within the Department are

**5**

similarly situated, the *Reeves* Decree mandates that the promotions conferred annually by Defendants be allocated substantially on the basis of race. Plaintiffs, therefore, have alleged proper equal protection claims.

B.      *The Relationship Between Section 1983 Equal Protection Claims and Title VII Employment Discrimination Claims*

We next address the district court's holding that Plaintiffs' section 1983 claims are procedurally barred because Plaintiffs did not also plead companion Title VII claims. Because this is an issue of first impression in this circuit, we begin our analysis by recounting the evolution of the interplay between section 1983 equal protection claims and Title VII employment discrimination claims.

The juxtaposition of these two causes of action emerged in 1972 when Congress amended the Civil Rights Act of 1964 to make Title VII applicable to state and municipal employers, against which section 1983 previously had been the principal avenue for seeking redress for complaints of discrimination. *See* Pub.L. No. 92-261, § 2, 86 Stat. 103, 103 (1972). Courts subsequently confronted the possibility that Title VII had supplanted section 1983 claims as the appropriate remedy against these employers, but instead found that the legislative history of the amendments revealed that such was not Congress' intent. *See, e.g., Keller v. Prince George's County,* 827 F.2d 952, 958-62 (4th Cir.1987) (exhaustively detailing the legislative history surrounding the amendments); *see also* H.R.Rep. No. 92-238, at 78-79 (1971), *reprinted in* 1972 U.S.C.C.A.N. 2137, 2154. Indeed, "every circuit [to] consider[ ] this issue [held] that Title VII[was] not the exclusive remedy for discrimination claims against state or municipal employers, where those claims derive from violations of Constitutional rights." *Annis v. County of Westchester,* 36 F.3d 251, 254-55 (2d Cir.1994) (listing cases).

Following the passage of the Civil Right Act of 1991 and amendments to Title VII made therein, courts again considered the preclusive effect Title VII might have on section 1983 equal protection claims. In *Johnson v. City of Fort Lauderdale,* 148 F.3d 1228, 1231 (11th Cir.1998), this court held that "the Civil Rights Act of 1991 did not render Title VII ... the exclusive remed[y] for public sector employment discrimination, thereby preempting a constitutional cause of action under [section] 1983." *Accord Beardsley*

**6**

*v. Webb,* 30 F.3d 524, 527 (4th Cir.1994). Section 1983 therefore remains an available cause of action for bringing equal protection claims against municipal employers which allegedly have engaged in employment discrimination.

From this baseline, the district court made a considerable leap in holding that the viability of a section 1983 equal protection claim is contingent upon the concurrent pleading of a Title VII claim. To support its holding, the district court cited *Burtnick v. McLean,* 953 F.Supp. 121, 123 (D.Md.1997), in which that court grappled with what it perceived as a conflict in Fourth Circuit authority. In *Keller,* 827 F.2d at 962 (pre-Civil Rights Act of 1991), and later in *Beardsley,* 30 F.3d at 527 (post-Civil Rights Act of 1991), the Fourth Circuit had held that Title VII does not preempt section 1983 equal protection claims. Subsequent to both decisions, but without disputing their holdings, the Fourth Circuit in *Hughes v. Bedsole,* 48 F.3d 1376, 1383 n. 6 (4th Cir.1995), cryptically remarked that the plaintiff in that case "[could] not bring an action under [section] 1983 for violation of her Fourteenth Amendment rights because [she] originally could have instituted a Title VII cause of action." The *Burtnick* court considered itself "constrained to follow the more recent pronouncement of the Fourth Circuit in *Hughes,*" 953 F.Supp. at 123, and accordingly entered summary judgment against all of that plaintiff's section 1983 claims. We, however, are not so constrained and repudiate the Fourth Circuit's apparent disposition of this issue.

The *Hughes* court predicated its holding on the Supreme Court's decision in *Great American Federal Savings & Loan Ass'n v. Novotny,* 442 U.S. 366, 378, 99 S.Ct. 2345, 2352, 60 L.Ed.2d 957 (1979), in which the Court concluded that section 1985(3), the conspiracy counterpart to section 1983, "may not be invoked to redress violations of Title VII." We find *Novotny* inapposite to the issue that was before the Fourth Circuit and is now before us. The *Novotny* Court recognized that section 1985(3), like section 1983, is a purely remedial statute that "provides no substantive rights itself," but instead provides a civil cause of action when some elsewhere-defined federal right has been violated. *Id.* at 372, 99 S.Ct. at 2349. In his section 1985(3) claim, the *Novotny* plaintiff averred only that his rights secured by Title VII had been infringed. *See id.* at

**7**

369, 99 S.Ct. at 2347. Because Title VII independently authorizes a cause of action, *see* 42 U.S.C. § 2000e-5(f) (1999), the *Novotny* Court rationalized that a plaintiff may not allege a violation of Title VII through section 1985(3); to hold otherwise would allow a plaintiff to avail him or herself of the statute's protection and yet potentially circumvent the statute's prerequisite administrative protocol. *See* 442 U.S. at 375-76, 99 S.Ct. at 2350-51.

*Novotny* 's narrow holding does not compel the conclusion reached by the Fourth Circuit in *Hughes*. Unlike the *Novotny* plaintiff, the *Hughes* plaintiff did not identify Title VII as the predicate federal law allegedly violated; rather, she claimed frustration of her equal protection rights, which are rooted in the Constitution, not in Title VII. *See* 48 F.3d at 1383 n. 6. Plaintiffs here have alleged the same, and "[b]ecause this case involves the assertion of constitutional rights, the holding of *Novotny* simply does not apply."[5] *Dickerson v. Alachua County Comm'n,* 200 F.3d 761, 766-67 (11th Cir.2000).

The only circuit squarely to have addressed the issue of whether a section 1983 equal protection claim is viable if brought absent a companion Title VII claim is the Second Circuit. In *Annis,* the court, after assenting that Title VII and section 1983 are equally cognizable causes of action available to remedy public sector employment discrimination, reasoned that because section 1983 claims are not preempted by Title VII, they need not be accompanied by Title VII claims. 36 F.3d at 254-55. Defendants cite no authority suggesting that the availability of multiple causes of action obligates a plaintiff to pursue every option. We

---

[5]This court acknowledged in *Johnson* the concern that "public employees will be able to undermine Title VII's procedural safeguards by suing directly under [section] 1983 for unconstitutional employment discrimination," but resolved that "such a result is merely a 'byproduct' of Congress's choice to make multiple remedies available." 148 F.3d at 1231. Although this duplicates the argument the Supreme Court found persuasive in *Novotny,* the *Johnson* court dismissed it. The explanation for the seemingly disparate treatment of the argument is unremarkable, yet instructive: in *Novotny,* the Supreme Court foreclosed multiple causes of action to remedy the rights created by a single statute—Title VII; in *Johnson,* however, this court merely respected Congress' prerogative to create distinct causes of action to remedy rights of differing origins—Title VII to enforce those rights secured by that statute, and section 1983 to seek the redress of rights for which a cause of action has not been explicitly authorized, such as those guaranteed by the Constitution.

therefore echo the Second Circuit's conclusion in *Annis*[6] and hold that a section 1983 claim predicated on the violation of a right guaranteed by the Constitution—here, the right to equal protection of the laws—can be pleaded exclusive of a Title VII claim. Although discrimination claims against municipal employers are often brought under both Title VII and the equal protection clause (via section 1983), the two causes of action nonetheless remain distinct. Plaintiffs' section 1983 equal protection claims, therefore, are not barred by Plaintiffs' failure to plead Title VII claims.

C.      *The Appropriate Analytical Framework for Evaluating Plaintiffs' Equal Protection Claim*

The district court also reached the merits of Plaintiffs' claims and applied the analytical framework outlined by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-04, 93 S.Ct. 1817, 1824-25, 36 L.Ed.2d 668 (1973), and familiar to employment discrimination suits. We have no occasion to review the district court's analysis, however, because we agree with Plaintiffs that *McDonnell Douglas* does not provide the appropriate framework for evaluating the merits of their claims.

The district court did not construe Plaintiffs' claims as an attack on the constitutionality of the *Reeves* Decree,[7] but rather as a routine complaint of several alleged instances of employment discrimination. The district court misapprehended the true nature of Plaintiffs' claims. In their complaint, Plaintiffs alleged that the *Reeves* Decree "fails to survive contemporary equal protection strict scrutiny."[8] Moreover, in addition to seeking money damages for past alleged equal protection violations, Plaintiffs requested "a declaration invalidating and striking or modifying those provisions [of the *Reeves* Decree] to bring them into compliance with current standards of Equal Protection" and "[a] corresponding injunction prohibiting defendants from

---

[6]Incidentally, this court cited the *Annis* holding with approval in *Johnson. See* 148 F.3d at 1231.

[7]*See* Order at 7 (granting Defendants' motion for summary judgment and denying Plaintiffs' motion for partial summary judgment) ("The validity of the consent decree is not at issue."), *in* R2, Tab 99.

[8]Thigpen Compl. at 7, *in* R1, Tab 1; *see also* Allen Compl. at 6, *in* R2, Tab 59.

making future promotions based in whole or in part on race."[9] Plaintiffs thus are challenging the continued constitutionality of the *Reeves* Decree insofar as it operates as a policy for appropriating promotions within the Department.

Although this court does "evaluate ... [section] 1983 race discrimination claims *supported by circumstantial evidence* using the framework set out ... in *McDonnell Douglas," Harris v. Shelby County Bd. of Educ.,* 99 F.3d 1078, 1082-83 (11th Cir.1996) (emphasis added), this suit does not involve such claims. As we previously have recognized, the *Reeves* Decree "establishe[d] certain mandatory racial quotas for hiring and promotion within the Bibb County Sheriff's Department." *See Reeves,* 754 F.2d at 967. We construe this provision to constitute an affirmative action plan, *see In re Birmingham Reverse Discrimination Employment Litig.,* 833 F.2d 1492, 1501 (11th Cir.1987) (*Birmingham I* ), the constitutionality of which is evaluated according to the standard introduced in *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989). *See Engineering Contractors Ass'n v. Metropolitan Dade County,* 122 F.3d 895, 906 (11th Cir.1997) (evaluating programs that created preferences based on race and ethnicity pursuant to *Croson* ).

In *Croson,* the Supreme Court adjudged the constitutionality of a plan that "required prime contractors to whom the city [of Richmond] awarded construction contracts to subcontract at least [thirty percent] of the dollar amount of the contract to one or more [minority-owned businesses]." 488 U.S. at 477, 109 S.Ct. at 713. The Court observed that this affirmative action plan:

> denie[d] certain citizens the opportunity to compete for a fixed percentage of public [construction] contracts based solely upon their race. To whatever racial group these citizens belong, their "personal rights" to be treated with equal dignity and respect are implicated by a rigid rule erecting race as the sole criterion in an aspect of public decisionmaking.

---

[9]Thigpen Compl. at 9-10, *in* R1, Tab 1; *see also* Allen Compl. at 7, *in* R2, Tab 59.

*Id.* at 493, 109 S.Ct. at 721 (plurality portion of the principal opinion). Because the plan created a facial racial classification, a majority of the Court subjected the plan to strict scrutiny, *see id.,*[10] which requires that the racial classification serve a compelling governmental interest and be narrowly tailored to the achievement of that interest, *see Wygant v. Jackson Bd. of Educ.,* 476 U.S. 267, 273-74, 106 S.Ct. 1842, 1847, 90 L.Ed.2d 260 (1986) (plurality portion of the principal opinion); *Engineering Contractors,* 122 F.3d at 906.

*Croson* 's analytical framework applies with equal force to affirmative action plans that influence the treatment of employees by governmental employers. *See, e.g., In re Birmingham Reverse Discrimination Employment Litig.,* 20 F.3d 1525, 1544 (11th Cir.1994) (*Birmingham II* ). Indeed, this court's *Birmingham II* decision is particularly instructive because its underlying facts are similar to those of the instant case. In *Birmingham II,* the court assessed the constitutionality of an affirmative action policy adopted in partial settlement of an employment discrimination suit. *See id.* at 1530-31. Like the *Reeves* Decree, the *Birmingham II* plan mandated that a fixed percentage of promotions within a particular job category be awarded to black applicants, irrespective of the percentage of blacks in the labor force or applicant pool. *See id.* at 1531-32. In applying the *Croson* framework, the court found that the municipality possessed a compelling interest in the remediation of past discrimination within the Birmingham Fire Rescue Service. *See id.* at 1545. Indeed,

> the interest that is alleged in support of racial preferences is almost always the same—remedying past or present discrimination. That interest is widely accepted as compelling. As a result, the true test of an affirmative action program is usually not the nature of the government's interest, but rather the adequacy of the evidence of discrimination offered to show that interest.

---

[10]Although only a plurality of the court joined this portion of the opinion, Justice Scalia "agree[d] ... with Justice O'Connor's conclusion that strict scrutiny must be applied to all governmental classification by race." *Croson,* 488 U.S. at 520, 109 S.Ct. at 735-36 (Scalia, J., concurring); *see also Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 222, 115 S.Ct. 2097, 2110, 132 L.Ed.2d 158 (confirming that *Croson* finally resolved that "the single standard of review for racial classifications should be strict scrutiny").

*Ensley Branch, N.A.A.C.P. v. Seibels,* 31 F.3d 1548, 1565 (11th Cir.1994) (citations and quotations omitted).

In determining whether the *Birmingham II* plan was narrowly tailored to achieving that remediation, the court explained:

> Several factors determine whether race-based promotional relief is narrowly tailored to accomplish a compelling purpose, including: the necessity for the relief and the efficacy of alternative remedies, the flexibility and duration of the relief, including the availability of waiver provisions, the relationship of numerical goals to the relevant labor market, and the impact of the relief on the rights of [non-minority officers].

*Birmingham II,* 20 F.3d at 1545 (internal citation and quotation omitted).

We conclude that *Croson, Birmingham II,* and commensurate decisions, not *McDonnell Douglas,* provide the proper framework in which to evaluate Plaintiffs' claims challenging the constitutionality of the *Reeves* Decree. Summary judgment therefore was inappropriate, and the case is remanded for further proceedings.[11]

Defendants assert that regardless of the analytical framework, they are entitled to summary judgment because: (1) the *Reeves* Decree does not require the sheriff to award individual promotions based on race; (2) even absent the *Reeves* Decree, the promotions would have been awarded to the same officers; and (3) judicial oversight of the *Reeves* Decree shields Defendants from liability. We find no merit in any of these assertions.

Defendants contend that their compliance with the *Reeves* Decree[12] does not evince the commission of equal protection violations because the terms of the *Reeves* Decree do not compel the sheriff to consider race when awarding individual promotions. They cite the deposition testimony of Sheriff Johnson, in which

---

[11]We acknowledge that in the wake of *Birmingham II,* Defendants' burden under the strict scrutiny standard is an onerous one. As this court observed in *Birmingham II:* "Our review has located no case approving a ... government affirmative action plan where the promotion remedy was not tied in some manner to the representation of minorities in the pool of candidates for promotion." 20 F.3d at 1543.

[12]Defendants profess continuous compliance with the terms of the *Reeves* Decree in their answer to Plaintiffs' complaints. *See* Defs.' Answer to Thigpen Compl. at 9, *in* R1, Tab 7; Defs.'Answer Allen Compl. at 2, *in* R2, Tab 72.

he explained that he did not perceive the *Reeves* Decree to create "black slots";  instead, he believed that he had discretion to select for promotion two white or two black applicants in a row rather than to alternate his selections between white and black applicants one-for-one.[13]  Because the *Reeves* Decree permits the sheriff to promote officers of the same race consecutively, Defendants argue that an applicant's race is not dispositive of his or her ability to compete for any particular promotion.  Defendants' myopic explication of the mandate of the *Reeves* Decree is unpersuasive.  The pattern in which the promotions are conferred is irrelevant, because the result is the same:  fifty percent of the annual promotions must be awarded to black officers, effectively excluding white officers from consideration for those promotions.  Although the *Reeves* Decree may not preordain the race of the officer receiving any one promotion, it does demand a racial allocation of the promotions conferred annually, thus potentially creating the constitutional infraction identified in *Croson.*

Defendants' invocation of the so-called "same decision defense" is likewise unavailing.  Defendants' contend that even absent the *Reeves* Decree, they would have made the identical selections for the promotions at issue.  Any consideration of race, therefore, was superfluous and, more importantly, not determinative of who received the promotions.  Defendants rely on this court's decision in *Evans v. McClain of Georgia, Inc.,* in which we held that an employer could avoid Title VII liability "by proving ... that it would have made the same [employment] decision even if it had not taken the [illegitimate criterion] into account."  131 F.3d 957, 962 (11th Cir.1997) (per curiam) (quoting *Price Waterhouse v. Hopkins,* 490 U.S. 228, 258, 109 S.Ct. 1775, 1795, 104 L.Ed.2d 268 (1989)).  Although this court also has permitted this defense in section 1983 equal protection claims, *see Whiting v. Jackson State Univ.,* 616 F.2d 116, 122 (5th Cir.1980),[14] it is immaterial to a constitutional challenge to an affirmative action plan that imposes a racial classification.  As the Supreme Court has pronounced:

---

[13]*See* R2, Tab 70 at 44, 47-48, 101 (Johnson Dep.).

[14]Decisions by the former Fifth Circuit issued before October 1, 1981, are binding as precedent in the Eleventh Circuit.  *See Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981) (en banc).

**13**

When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier.... The "injury in fact" in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit.

*Northeastern Fla. Chapter of the Assoc. Gen. Contractors of Am. v. City of Jacksonville,* 508 U.S. 656, 666, 113 S.Ct. 2297, 2303, 124 L.Ed.2d 586 (1993). Accordingly, Plaintiffs' alleged constitutional injury was inflicted by their exclusion from consideration for one-half of the promotions conferred annually; their failure to be promoted is merely a manifestation of that injury. Defendants' assertion that they would not have promoted Plaintiffs even in the absence of the *Reeves* Decree is therefore irrelevant.[15]

We next consider Defendants' assertion that the supervision of a federal district judge over the implementation of the *Reeves* Decree severed the causal connection between their conduct and the Plaintiffs' alleged injuries. *See Rheuark v. Shaw,* 628 F.2d 297, 305 (5th Cir.1980) ("In order for a governmental unit to be liable under [section] 1983, the policy or custom [of that unit] must ... be a proximate cause of the constitutional violation."). The district judge who presided over the original *Reeves* suit has monitored the implementation of the *Reeves* Decree since its inception. Without citing any supporting authority, Defendants argue that the judge's oversight should relieve them of any liability for concomitant constitutional violations. In *Birmingham I,* however, this court entertained Title VII and section 1983 attacks on a consent decree overseen by a federal district judge and "rejecte[d] any notion that the memorialization of [a] voluntary undertaking in the form of a consent decree somehow provides the employer with extra protection against charges of illegal discrimination." 833 F.2d at 1501.

---

[15]If, on remand, Plaintiffs are unable to demonstrate that they would have been promoted but for the operation of the *Reeves* Decree, they will not be entitled to compensatory damages, i.e., back pay and emotional distress. *See Carey v. Piphus,* 435 U.S. 247, 255, 98 S.Ct. 1042, 1047-48, 55 L.Ed.2d 252 (1978). That, however, would not defeat Plaintiffs' claims; even in the absence of compensable damages, should Plaintiffs prove that compliance with the *Reeves* Decree violates the equal protection clause and thus has caused them a constitutional injury, they would be entitled to nominal damages, *see Irish Lesbian & Gay Org. v. Giuliani,* 143 F.3d 638, 651 (2d Cir.1998) (authorizing nominal damages for the violation of one's equal protection rights even when not requested in the complaint), as well as possibly the declaratory and injunctive relief they seek.

To summarize, the district court erred in evaluating Plaintiffs' claims pursuant to the *McDonnell Douglas* burden-shifting analysis. The proper analytical framework is that outlined in *Croson,* and, on remand, Plaintiffs' challenge to the constitutionality of the *Reeves* Decree must be assessed accordingly.

D.      *The Timeliness of Plaintiffs' Equal Protection Claims*

The statute of limitations for a section 1983 claim arising out of events occurring in Georgia is two years.[16] *See Williams v. City of Atlanta,* 794 F.2d 624, 626 (11th Cir.1986). This suit was filed in August 1996, dating the statute of limitations back to August 1994. Only the promotion of Charles Gantt occurred within this limitations period. The district court thus held that Plaintiffs were barred from seeking redress for the equal protection violations allegedly caused by the promotions conferred by former Sheriff Wilkes between 1986 and 1992 (the "Wilkes promotions"). Plaintiffs rejoin that because all the promotions at issue were conferred according to the terms of the *Reeves* Decree, they constitute a single "continuing violation" of the equal protection clause.[17]

"In determining whether a discriminatory employment practice constitutes a continuing violation, this Circuit distinguishes between the present consequence of a one time violation, which does not extend the limitations period, and the continuation of that violation into the present, which does." *Calloway v. Partners Nat'l Health Plans,* 986 F.2d 446, 448 (11th Cir.1993) (internal quotation omitted). In support of their characterization of the alleged violations, Plaintiffs cite *Beavers v. American Cast Iron Pipe Co.,* 975 F.2d

[16]The district court stated that the statute of limitations was only one year. The parties agree that this was harmless error, however, because the conduct which Defendants assert falls outside of the statute occurred more than two years before this suit was filed.

[17]We note that the Gantt promotion in 1996 occurred within the two-year statutory period; Plaintiffs' claims, therefore, cannot be entirely barred. *See Knight v. Columbus, Georgia,* 19 F.3d 579, 582 (11th Cir.1994). Moreover, "[a] discriminatory act which is not made the basis for a timely charge ... may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue." *United Air Lines, Inc. v. Evans,* 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977). Practically speaking, therefore, allowing Plaintiffs to challenge all of the allegedly discriminatory promotions would only affect the amount of damages to which they would be entitled should they succeed in establishing liability. *Cf. Knight,* 19 F.3d at 582 ("The term 'continuing violation' ... implies that there is but one incessant violation and that the plaintiffs should be able to recover for the entire duration of the violation.").

**15**

792, 794 (11th Cir.1992), in which this court considered a Title VII claim challenging an employer's benefits policy that denied insurance coverage to children who did not reside full-time with their employee-parent. The court held that although the policy was instituted outside of the statute of limitations, the plaintiff's claim was nonetheless timely because the employee's alleged injury—lack of insurance coverage for his non-custodial children—was "the direct result of [an] on-going policy actively maintained by [the employer]." *Id.* at 798. Plaintiffs argue that the *Reeves* Decree qualifies as such an "on-going policy" and that, consequently, *Beavers* controls. Because we conclude that *Beavers* is distinguishable, we disagree. In *Beavers,* the injury of which the plaintiff complained was his children's uninsured status—an injury caused by his employer's continuous refusal to provide coverage. By contrast, any equal protection violation precipitated by the *Reeves* Decree only manifests itself when an opportunity for a promotion arises and applicants accordingly are evaluated. Although the *Reeves* Decree is continuously in effect, it does not continuously injure Plaintiffs' equal protection rights.

We find the circumstances of the instant case more akin to those in *Knight v. Columbus, Georgia,* 19 F.3d 579, 580 (11th Cir.1994), in which we addressed the legality under the Fair Labor Standards Act (the "FLSA"), 29 U.S.C. §§ 201-19, of a city-employer's labor classification scheme. *See* 19 F.3d at 580. The FLSA requires an employer to pay all non-exempt employees for overtime work. *See* 29 U.S.C. § 207 (1993). The plaintiffs alleged that the city had misclassified them as "exempt executive or administrative employees" and accordingly failed to pay appropriate overtime. *See Knight,* 19 F.3d at 580. The plaintiffs sought damages for all overtime pay allegedly owed them, including for work performed outside the FLSA's statute of limitations. This court held that the plaintiffs had a cause of action with respect to only those claims that accrued within the statute of limitations. *See id.* at 582. The court observed that "[i]nstead of one on-going violation, [*Knight* ] involve[d] a series of repeated violations of an identical nature. Because each violation gives rise to a new cause of action, each failure to pay overtime begins a new statute of limitations period as to that particular event." *Id.* This is analogous to the situation presented here: although the *Reeves* Decree,

**16**

like the classification scheme at issue in *Knight,* is a constant, it gives rise to discrete violations, each triggering its own statute of limitations period. The period for each of the Wilkes promotions has expired. On remand, therefore, Plaintiffs may rely only on the promotion of Charles Gantt as their means for challenging the constitutionality of the *Reeves* Decree.

E.    *Plaintiffs' Cross-Motion for Partial Summary Judgment*

Finally, we address Plaintiffs' appeal of the district court's denial of their cross-motion for partial summary judgment on the issue of liability. Plaintiffs assert that they are entitled to partial summary judgment because Defendants' undisputed compliance with the *Reeves* Decree conclusively evinces an unconstitutional accounting of race in the conferral of promotions within the Department.

The district court's grant of summary judgment to Defendants logically demanded the denial of Plaintiffs' corresponding cross-motion. Although we now reverse the district court's grant of Defendants' motion, we nonetheless affirm its denial of Plaintiffs' cross-motion.[18] As we have explained, the operation of the *Reeves* Decree does not necessarily offend the equal protection clause. Before a determination of liability is appropriate, Defendants must be afforded an opportunity on remand to defend the constitutionality of the *Reeves* Decree within the framework outlined above.

## III. CONCLUSION

We REVERSE the district court's grant of Defendants' motion for summary judgment, AFFIRM its denial of Plaintiffs' cross-motion for partial summary judgment, and REMAND the case for further proceedings consistent with this opinion.

---

[18]This court may affirm a decision of the district court on any adequate ground. *See Parks v. City of Warner Robins,* 43 F.3d 609, 613 (11th Cir.1995).

**17**