Michael W. BASS Plaintiff-Appellant,

v.

BOARD OF COUNTY COMMISSIONERS, Orange County, Florida, Defendant-Appellee.

No. 99-10579.

United States Court of Appeals,

Eleventh Circuit.

July 9, 2001.

Appeal from the United States District Court for the Middle District of Florida. (No. 97-00308-CIV-ORL-18), G. Kendall Sharp, Judge.

ON PETITION FOR REHEARING

Before BLACK, CARNES and KRAVITCH, Circuit Judges.

CARNES, Circuit Judge:

Our previous opinion in this case, published at 242 F.3d 996 (11th Cir.2001), is vacated. In its place, on petition for rehearing, we substitute this revised opinion. No member of the Court having requested a poll, we deny the suggestion for rehearing en banc. *See* Fed. R.App. P. 35; 11th Cir. R. 35-5.

Michael W. Bass appeals the district court's order granting summary judgment to the Board of County Commissioners of Orange County in his lawsuit claiming race discrimination in violation of Title VII and the Equal Protection Clause, as well as retaliation in violation of Title VII. For the reasons set forth below, we reverse and remand for a jury trial on his race discrimination and retaliation claims.

## I. BACKGROUND

### A. Facts

In August 1995, the Orange County Fire and Rescue Division (the "Division" or "Fire and Rescue Division") began a reorganization of its workforce as a result of a $9 million budget shortfall. A number of positions were eliminated, including all four Training Captain positions, one of which was held by Michael Bass, the white male plaintiff in this case. Like the other three people employed in that position, Bass received a layoff notice in September 1995.

The four Captain-level positions that were eliminated were replaced with three Lieutenant-level Training Instructor positions. Bass applied for one of those three positions. In order to become a Training Instructor, the County specified that a person must have "two years training instructor or closely related work experience" and "must possess and maintain a valid Florida Department of Education Teacher's Certificate

or obtain [one] within 18 months of employment." Bass' qualifications exceeded those minimums. Moreover, according to Frank Montes de Oca, who was Chief in Charge of Training at the Division, as a training instructor Bass "was an excellent employee who constantly received good or outstanding evaluations." He was first or second in seniority among instructors, and, under terms of the union contract, should have been the last or next to last to be laid off in the event of a reduction in force.

All qualified persons, including those who had been laid off, were allowed to apply for the three Training Instructor positions. The Fire and Rescue Division used a Performance Based Interview system to select candidates for various positions, including the Training Instructor positions. In that type of interview, candidates are asked pre-selected questions to test their responses to hypothetical situations they may face on the job. The candidates are expected to respond by explaining what they have done in similar situations.

A three-member panel interviewed Bass and twelve other applicants for the three Training Instructor positions. The members of the interview panel were Charles Middleton (black male), Ray Valle (Hispanic male), and Betty Meeks (black female). At the time of the reorganization, Middleton was the Acting Assistant Department Manager in charge of Administration and had supervisory responsibility over the Division's Training Instructors. He was also a member of the Progressive Firefighters Association, an advocacy organization for black firefighters, and he was known to support affirmative action and a promotional "fast track" for minorities.

Middleton testified that he selected Meeks and Valle for the interview panel and that, in doing so, he "[t]ried to select people who had little or no involvement with the training function" so that they would have had nothing at stake in the Division's reorganization. Meeks was employed in the County's Human Resources Department, and admits that she had no knowledge beyond that of a lay person concerning the position of fire department training instructor. She was also known to be a supporter of affirmative action. Although Valle was employed by the Division, he worked as an information technology specialist and had no training in firefighting. Nothing in the record indicates Valle's views on affirmative action. Therefore, with the possible exception of Middleton,[1] none of the panel members was a certified firefighter in Florida,

---

[1]The record is less clear with respect to Middleton's experience and credentials. The record seems to indicate that Middleton was not a certified firefighter in the State of Florida. Furthermore, although the record shows that Middleton had supervisory responsibility over the Division's Training Instructors, nothing in the record indicates that Middleton had any personal experience as a Training Instructor. Given the procedural posture, of course, we are required to view the facts in the light most favorable to the non-movant, Bass. Viewing the evidence that way, Middleton was not a certified firefighter and had no experience as a Training Instructor.

nor had any panel member held a Training Instructor position.

Not only did the panel members lack experience as Training Instructors, none of them was given any training or guidelines (other than general training concerning interview skills) to help them evaluate which candidates were best qualified for the positions. Remarkably, none of them received any job description showing the duties of a Training Instructor. Nor did any of them receive the interview questions until just before the start of the interviews. They were not told to take notes of the interviews, and none of them did.

Mitch Floyd, who was Chief of the Fire and Rescue Division from 1989 until April 1995, stated in his affidavit that the County had adopted the interview process "to create some leeway to allow us to promote minority candidates." He stated under oath that the interview score was not supposed to be determinative, but was meant to be only one of several factors, including education, experience, and diversity (*i.e.,* race and gender) that were to be considered. The County's written policy specifically stated that scores were not to be totaled and that the interview was only one component to be considered. Similarly, Tom Preston (not related to one of the candidates, Henry Preston), who developed the interview process for the Training Instructor position, stated that the interview scores were not intended to be determinative. The interviews for the Training Instructor positions took place in October 1995. After the panel finished interviewing all the candidates, the panel members combined their individual scores for each candidate and then ranked the candidates based on their aggregate interview scores. The panel ranked Bass ninth out of the thirteen applicants. Middleton and Valle testified that Bass did not answer the questions that were asked and did not interview as well as expected considering his experience as a training officer. (Meeks was not questioned about Bass interview performance during her deposition.) Contrary to the written policy and all the testimony about how the interview results were to be used, selections for the Training Instructor position were made solely on the basis of the interview scores.[2] Because Bass received a low score on the interview, the panel

---

[2]The interview scores were as follows:

| Name | Previously Supervisor | Score | Selected | | Race |
|------|----------------------|-------|----------|---|------|
| Gina McCollum | | Yes | 16 | X | W |
| Dan Kucik | No 15 | | | | W |
| Donna Reed | Yes | 13 | X | | W |
| Henry Preston | No 13 | | X | | B |
| David Cohen | No 12 | | | | W |

did not choose him for one of the three Training Instructor positions. Instead, the panel chose three of the applicants whom it had given higher interview scores: a black male and two white females.

Henry Preston, the black candidate selected for one of the three Training Instructor positions, did not even meet the minimum qualifications for the position. His resume reflected that he had no experience as a Training Instructor and only two years of experience as a firefighter, even though one of the minimum requirements for a Training Instructor position was "two (2) years training instructor or closely related work experience." Moreover, Preston misrepresented his qualifications both on his general employment application and on his Training Instructor application. Although Preston represented on those documents that he attended the University of Central Florida for three years as an accounting major and earned 94 credits there, he had never attended that university. Preston testified in his deposition that the County's Human Resources Department knew he had "exaggerated" his educational credits. Initially he had submitted an application which truthfully showed he lacked the necessary qualifications, but someone from Human Resources told him that his application needed to be changed before it would be accepted. Taking the suggestion, Preston submitted a second application, and this one falsely stated he had attended the University of Central Florida. It was only on the basis of that lie about his qualifications, a lie he testified the County had encouraged, that Henry Preston was judged to be qualified for a Training Instructor position.

---

| Name | Selected | Rank | Race |
|------|------|------|------|
| Karen Barber | No | 12 | W |
| Henry Butts | No | 11 | W |
| John Russell | Yes | 10 | B |
| **Michael Bass** | Yes | 8 | W |
| Victoria Quick | No | 7 | W |
| Stephen Manning | No | 5 | W |
| Thomas Wheeler | No | 4 | W |
| Terry Boston | No | 4 | W |

The candidate with the second-highest score, Dan Kucik, was selected for (and accepted) the higher-ranking position of Group Supervisor. The Group Supervisors were chosen through a separate selection process which involved different PBI interviews. Therefore, Kucik's performance during his Training Instructor interview does not account for his selection as a Group Supervisor. John Russell (black male), who ranked eighth in the Training Instructor interview was also selected as a Group Supervisor. Bass applied for a Group Supervisor position, but was not selected.

After being denied a Training Instructor position for which he was indisputably qualified, Bass was given the choice of being demoted to engineer/paramedic or being laid-off. He took the demotion. In October 1995, Bass filed a union grievance challenging his demotion and removal from training duties. On November 17, 1995, while his grievance was pending, Bass complained to the Division Chief James Moody that Henry Preston lacked the necessary qualifications for the Training Instructor position. Bass recorded the events in his diary, writing as follows:

> Met with Moody.... Advised him that Preston, Reed and Kucik did not have an A.S. degree, only high school degree and Reed had a GED and Preston did not qualify for training position. Witnessed by Wertz and Angel Gonzales. *Moody advised me that the County will continue to promote based on color* and that I should file legal action against the County.

(emphasis added).

In December 1995, the County settled Bass' union grievance without a hearing by reassigning him to be a fourth Training Instructor. Bass was given the job title, rank, and pay of a Training Instructor, but he was not assigned to a district and was not permitted to perform the duties of a Training Instructor. Before the reorganization, there were four Training Instructors, each holding the rank of Captain, assigned to cover five battalions. After the reorganization, there were three Training Instructors, each holding the rank of Lieutenant, assigned to cover three districts (as the battalions were renamed). One Training Instructor was assigned to each of the three districts. As a result, when the Division finally made Bass a Training Instructor he was the fourth one, and there was no vacant district to assign him.

In December 1995, on his first day as a Training Instructor, Bass was assigned to clean out a warehouse—work ordinarily done by inmates supplied by the Department of Corrections. Between December 1995 and April 1996, Bass had no routine work assignments, performed custodial and clerical duties, and usually was supervised by personnel who were less senior than he. Middleton, who was in charge of the Training Instructors, and Chief Smith ordered Bass not to record on his work logs the custodial and clerical work he was performing.

Bass' non-custodial assignments included working with the Division's Emergency Medical Services unit, working on the Community Health Care Initiative, teaching CPR for Head-start day care workers, and assisting other Training Instructors in developing training programs. Bass was not permitted to earn overtime pay, on-call pay, riding-out-of-classification pay, or adjunct teaching pay, all of which were available to the other Training Instructors. Although he previously had been permitted to teach numerous outside courses, such as a SWAT team tactical rope course offered at various law enforcement agencies, in his position as

Training Instructor Bass was denied all opportunities to teach outside courses. He also was required to take tests in order to retain his paramedic pay, while the three other training instructors were not.

In January 1997, Bass was transferred out of the Training Bureau without even being told of the transfer. He learned of the transfer upon returning from vacation and discovering that his paycheck was no longer available in the Training Bureau and that he was no longer on that bureau's payroll. From January until April of 1997, Bass did not know where he had been transferred or to whom he was to report. In April 1997, he was told to report for work in a non-budgeted position that was not covered by the union contract. After the union complained, Bass was allowed to keep his Training Instructor title, and he was given a temporary assignment under Chief Weagraff in Quality Assurance. In the spring of 1998, one of the three budgeted Training Instructor positions became available, but it was not given to Bass. In fact, it was never filled. At least as late as February 1999, Bass was still temporarily assigned to Chief Weagraff.

### B. Procedural History

Bass filed a ten-count complaint against the County on March 31, 1997. The complaint contained race discrimination claims under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq.;* Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.;* 42 U.S.C. § 1981; 42 U.S.C. § 1983; the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution; and the Florida Civil Rights Act of 1992, Fla. Stat. chs. 760.01-760.11. The complaint also contained retaliation claims under Title VII; 42 U.S.C. § 1981; the Florida Civil Rights Act of 1992, Fla. Stat. chs. 760.01-760.11; the First Amendment to the United States Constitution; and a claim under Florida's veterans' preference statutes, Fla. Stat. §§ 295.07 & 295.085.[3]

The County moved for summary judgment. With respect to the race discrimination claims, the County proffered as its reason for not giving Bass one of the Training Instructor positions his poor performance on the Performance Based Interview. With respect to Bass' retaliation claims, the County argued that Bass could not establish a prima facie case of retaliation, and that even if he could, he could not refute the County's asserted legitimate reason for its actions—he was not given Training Instructor duties because there was not an open district. The district court entered an order granting summary judgment to the County as to all counts in the complaint.

---

[3]On appeal, Bass does not challenge the district court's rulings on his Title VI or veterans' preference claims, but argues that the district court erred in granting summary judgment on his race discrimination and retaliation claims.

## II. STANDARD OF REVIEW

We review a district court's grant of summary judgment *de novo,* using the same legal standard employed by the district court. *See, e.g., Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1117 (11th Cir.1993). "Summary judgment is appropriate if the record shows no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. When deciding whether summary judgment is appropriate, all evidence and reasonable factual inferences drawn therefrom are reviewed in a light most favorable to the non-moving party." *Witter v. Delta Air Lines, Inc.,* 138 F.3d 1366, 1369 (11th Cir.1998) (citation and quotations omitted).

## III. DISCUSSION

### A. RACE DISCRIMINATION CLAIMS

In his complaint, Bass alleges that the County discriminated against him based on his race (non-Hispanic, white) in violation of Title VII, § 1981, § 1983, the Equal Protection Clause of the Fourteenth Amendment, and the Florida Civil Rights Act. Sometimes this type of claim, where a white employee alleges to be the victim of discrimination, is referred to as a "reverse discrimination" claim. Whatever the rhetorical effect of that phrase in the ongoing public debate over affirmative action may be, it has no place in the legal analysis of the alleged governmental action before us. Discrimination is discrimination no matter what the race, color, religion, sex, or national origin of the victim. *See McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273, 280, 96 S.Ct. 2574, 2579, 49 L.Ed.2d 493 (1976) (holding that Title VII prohibits discrimination against whites as well as non-whites). Our Constitution does not distinguish between races and neither do we. *See Plessy v. Ferguson,* 163 U.S. 537, 559, 16 S.Ct. 1138, 1146, 41 L.Ed. 256 (1896) (Harlan, J., dissenting) ("Our constitution is color-blind, and neither knows nor tolerates classes among citizens. In respect of civil rights, all citizens are equal before the law."). As Justice Scalia has observed, "In the eyes of government, we are just one race here. It is American." *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 239, 115 S.Ct. 2097, 2119, 132 L.Ed.2d 158 (1995) (concurring opinion); *see also Regents of Univ. of Cal. v. Bakke,* 438 U.S. 265, 289-90, 98 S.Ct. 2733, 2748, 57 L.Ed.2d 750 (1978) (Powell, J., plurality opinion) ("The guarantee of equal protection cannot mean one thing when applied to one individual and something else when applied to a person of another color."). Racial discrimination against whites is just as repugnant to constitutionally protected values of equality as racial discrimination against blacks. Therefore, we will treat Bass' Title VII and Equal Protection Clause discrimination claims as discrimination claims, not as

"reverse discrimination" claims, and we will analyze his claims exactly as we would any racial discrimination claim.

Although the analyses for Bass' Title VII and Equal Protection claims are closely related, the Supreme Court has recognized that it "do[es] not regard as identical the constraints of Title VII and the Federal Constitution." *Johnson v. Transportation Agency, Santa Clara County, Calif.,* 480 U.S. 616, 632, 107 S.Ct. 1442, 1452, 94 L.Ed.2d 615 (1987). In addressing the interplay between Title VII and § 1983, we recently concluded that Congress intended to make available separate, non-exclusive causes of actions and remedies under these provisions, and held that a plaintiff may bring a claim under one provision without asserting a claim under the other. *Thigpen v. Bibb County, Sheriff's Dep't,* 223 F.3d 1231, 1237-39 (11th Cir.2000). Because claims under Title VII and the Equal Protection Clause are distinct and the Supreme Court has instructed us that different standards are applicable to them, we will address these claims separately.

1. *Title VII Framework*

Title VII makes it an unlawful employment practice for an employer "to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). Bass alleges that the County violated Title VII by refusing to hire him for the Training Instructor position because he is a non-Hispanic, white person.

A plaintiff may establish a Title VII claim through the introduction of direct evidence of discrimination or through circumstantial evidence that creates an inference of discrimination. To evaluate Title VII claims based on circumstantial evidence, we use the familiar framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). *See Combs v. Plantation Patterns,* 106 F.3d 1519, 1527-28 (11th Cir.1997). Under this framework, the plaintiff must first establish a prima facie case of discrimination. *See Combs,* 106 F.3d at 1527-28 (citations omitted). In order to establish a prima facie case of race discrimination under Title VII, the plaintiff must show that: (1) he was qualified and applied for the position; (2) he was rejected despite his qualifications; and (3) other equally or less qualified employees who are not members of his race were hired. *See Taylor v. Runyon,* 175 F.3d 861, 866 (11th Cir.1999) (citing *Wu v. Thomas,* 847 F.2d 1480, 1483 (11th Cir.1988)). Once the plaintiff has made out a prima facie case of discrimination, the employer must articulate some legitimate,

non-discriminatory reason for the employee's rejection. *See Wu,* 847 F.2d at 1483-84. If the employer meets this burden of production, the plaintiff then must establish that each of the defendant's proffered reasons for hiring someone of a different race is pretextual. *See id.*

"[I]n cases of discrimination proven by direct evidence, it is incorrect to rely on the *McDonnell Douglas* test because, while circumstantial evidence is used to create an inference of discrimination under *McDonnell Douglas,* no such inference is required in the case of direct evidence." *Taylor,* 175 F.3d at 867 n. 2; *Evans v. McClain of Georgia, Inc.,* 131 F.3d 957, 962 (11th Cir.1997) ("[O]nce a plaintiff produces direct evidence of a discriminatory motive, and the trier of facts accepts this testimony the ultimate issue of discrimination is proved." (citation and internal quotation omitted)); *Trotter v. Board of Trustees of the Univ. of Ala.,* 91 F.3d 1449, 1453 (11th Cir.1996) ("When there is direct evidence that discrimination was a motivating factor in the challenged employment decision, the appropriate analysis is different from that employed in a case where only circumstantial evidence is available."). The defendant's burden when refuting direct evidence of discrimination is one of persuasion and not merely production. *See Hill v. Metropolitan Atlanta Rapid Transit Auth.,* 841 F.2d 1533, 1539 (11th Cir.1988). Bass attempts to prove his Title VII claim with both direct and circumstantial evidence of discrimination.

In this case, the County has not disputed that Bass established a prima facie case of discrimination under the *McDonnell Douglas* framework. Therefore, for purposes of summary judgment, we assume that Bass is in a protected class, was qualified to become a Training Instructor, applied for the position, was rejected despite his qualifications and was rejected in favor of another less qualified employee of a different race. The dispute in this case concerns whether Bass has also presented direct evidence of discrimination, and, if not, whether he has put forth sufficient circumstantial evidence that the County's proffered non-discriminatory reason for its actions (*i.e.,* Bass' poor performance during his interview) was pretextual. We now turn to these disputed issues.

### 2. *Title VII Direct Evidence Contention Based on Chief Moody's Statements*

First, Bass contends that a statement made to him by Chief Moody—the chief of the Fire and Rescue Division at the time of the decision not to offer Bass one of the Training Instructor positions during the 1995 reorganization—constitutes direct evidence of discrimination. Bass testified that he confronted Chief Moody about the promotion of employees who lacked the necessary qualifications for the Training Instructor position, and Moody responded that the County would continue to promote based on color. We agree with

the district court that this statement does not rise to the level of direct evidence of discrimination by the Division.

Direct evidence of discrimination is "evidence which, if believed, would prove the existence of a fact [in issue] without inference or presumption." *Earley v. Champion Int'l Corp.,* 907 F.2d 1077, 1081 (11th Cir.1990) (citation and emphasis omitted). "[O]nly the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of [race] ... constitute direct evidence of discrimination." *Damon v. Fleming Supermarkets of Fla., Inc.,* 196 F.3d 1354, 1358 (11th Cir.1999) (citations omitted). "For statements of discriminatory intent to constitute direct evidence of discrimination, they must be made by a person involved in the challenged decision." *Trotter v. Bd. of Trustees,* 91 F.3d 1449, 1453-54 (11th Cir.1996). "[R]emarks by non-decisionmakers or remarks unrelated to the decisionmaking process itself are not direct evidence of discrimination." *Standard v. A.B.E.L. Servs., Inc.,* 161 F.3d 1318, 1330 (11th Cir.1998).

Bass argues that Chief Moody's statement—made close in time to the decision to offer the Training Instructor positions to other candidates and against the backdrop of the County's affirmative action plans—constitutes direct evidence of discrimination. However, Bass presented no evidence showing that Moody was a decisionmaker or involved in the selection of the Training Instructors. Although Bass attaches significance to the fact that Moody was the chief at the time of the decision, the fact remains that Moody was not a member of the interview panel and was not involved in the selection process. Only statements by the persons involved in the decisionmaking process, here the interview panel members, could constitute direct evidence of discrimination. Therefore, although Moody's statements may provide significant circumstantial support for Bass' claims, they do not constitute direct evidence of discrimination. *See Standard,* 161 F.3d at 1330.

### 3. *Circumstantial Evidence Supporting the Title VII Claim*

Even though Chief Moody's statements are not direct evidence of discrimination, we believe that Bass has put forth ample circumstantial evidence of discrimination to permit his Title VII, § 1981 and Florida Civil Rights Act claims to go to a jury. In addition, for the reasons explained in section 4, *infra,* we find that the County's affirmative action plans, when viewed in light of the circumstantial evidence which would allow a reasonable jury to conclude that the Division was acting pursuant to those plans, do constitute direct evidence of racial discrimination against Bass. Therefore, we conclude that the district court erred in entering summary judgment against Bass' Title VII race discrimination claims.

It is undisputed that Bass established a prima facie case of race discrimination under the *McDonnell Douglas* framework. Consequently, a presumption of discrimination arose and the burden shifted to the County to proffer a legitimate, nondiscriminatory reason for not hiring Bass. *See Combs,* 106 F.3d at 1527-28. To meet that burden of production, the County proffered one reason, a subjective one, for not hiring Bass for a Training Instructor position. The County claimed that Bass did not score as well on his interview (purportedly the only selection criterion used) as the other candidates selected for the position.

This Court recently reaffirmed that a subjective reason for an employer's action—such as poor interview performance—can be as legitimate as any other reason. *See Chapman v. AI Transport,* 229 F.3d 1012, 1033 (11th Cir.2000) (en banc). An interview is frequently necessary to assess qualities that are particularly important in supervisory or professional positions. *Id.* at 1033. This is because "[t]raits such as common sense, good judgment, originality, ambition, loyalty, and tact often must be assessed primarily in a subjective fashion." *Id.* at 1034 (internal marks and citations omitted). However, in order for a subjective reason to constitute a legally sufficient, legitimate, nondiscriminatory reason, the defendant must articulate "a clear and reasonably specific factual basis upon which it based its subjective opinion." *Id.; see also Burdine,* 450 U.S. at 258, 101 S.Ct. at 1096 ("[T]he defendant's explanation of its legitimate reasons must be clear and reasonably specific" so that "the plaintiff be afforded a 'full and fair opportunity' to demonstrate pretext.").

Although the proffered reason, Bass' poor interview, was subjective, the County offered explanations of why the interview panel, the decisionmakers, arrived at that subjective conclusion. Valle stated that Bass "did not interview anywhere near as well as [he] expected him to" and observed that Bass "didn't answer the questions that [the interviewers] were asking." Middleton opined that Bass "could have presented himself better" and that Bass gave "answers irrespective of the questions." Bass' testimony does not contradict the panel members' assessment of his interview performance. Bass stated that he "had the impression that [the interview] was just some kind of a go-through-the-motion thing." Although Bass admitted that he did not perform well during the interview, he claimed that his poor performance was caused by Middleton's interrupting him while he was trying to answer the questions. Middleton did not recall interrupting Bass during the interview, but Valle testified that if a candidate was "headed in the wrong direction" the interviewers would "try and help" the candidate by "clarify[ing] what it was [they] were looking for."

Because the interviewers explained the grounds for their subjective evaluation with reasonable clarity

and specificity, the County met its burden of producing a legitimate, nondiscriminatory reason for not hiring Bass as a Training Instructor. After the County articulated this reason, the burden shifted back to Bass to present sufficient evidence to create a genuine issue of fact that the County's non-discriminatory reason was pretext for discrimination. In response, Bass argued that: (1) the County encouraged employees to hire and promote based on race and established a system for hiring and promotion which created leeway so that minorities could advance more easily; (2) Chief Moody said that the County was going to continue to promote on the basis of color; (3) Preston, the black candidate selected as a Training Instructor, did not meet the minimal qualifications for the position; (4) the Fire and Rescue Division deviated from its established procedures and the interview process was otherwise tainted; and last, but not least, (5) the County had in place affirmative action plans with the goal of increasing minority representation within the Division.

*a. Pressure to Hire and Promote Minorities*

With respect to Bass' first pretext argument, he introduced evidence of county officials' emphasis on hiring and promoting based upon race. Montes de Oca, Chief of the Fire and Rescue Division from 1990 though 1997, testified that he was pressured to hire more minorities and that he had received periodic reports showing the number of women and blacks in all positions. Mitch Floyd, Chief of the Division from 1989 until April 1, 1995, testified that managers' success or failure in meeting the County's affirmative action goals "could adversely affect their future as managers," and that the County Administrator, County Chairwoman, and the County Commission regularly communicated this to the Division managers. From that evidence a jury could reasonably find the County had a policy of racial discrimination against non-Hispanic whites.

Bass also presented evidence that the interview system, the same system that was used in hiring the Training Instructors, was used to carry out the affirmative action plans' goals of emphasizing race in hiring decisions, *i.e.,* the policy of racial discrimination against non-Hispanic whites. Floyd, who developed the interview system for the Training Instructor and Group Supervisor positions and who was a member of the Group Supervisor interview panel, testified that Performance Based interviews were adopted as a subjective evaluation process that would create "leeway" in promoting minorities because the County "didn't have the time or vacancies to wait out the gradual improvement of skills."

This evidence of pressure in the County to hire minorities over non-minorities, combined with the existence of an interview system adopted in order to create leeway to promote minorities, constitutes circumstantial evidence of discriminatory intent behind the Division's hiring decisions.

*b. Chief Moody's Statement Concerning Race-Based Promotion*

As to his second pretext argument, Bass testified that when he confronted Chief Moody about Henry Preston's lacking the requisite qualifications, Moody told him that the County would continue to promote on the basis of color. As we have already said, because Bass did not introduce sufficient evidence establishing that Moody was a decisionmaker, his statement cannot constitute direct evidence of discrimination. Nonetheless, this statement does constitute circumstantial evidence of discrimination because it raises the inference that the Training Instructor interview panel members improperly based their decisions on race, rather than performance during the interview or other legitimate criteria.

### c. Promotion of Less-Qualified Candidate

In support of his third pretext argument, Bass presented evidence that he was the most qualified applicant for the position and that Preston did not even meet the minimum qualifications for the position. At the time he applied for the Training Instructor position, Preston's resume reflected that he had no experience as a Training Instructor and only two years of experience with the Fire and Rescue Division and had earned no credits toward his teaching certificate. It should have been obvious on the face of Preston's application that he could not meet the mandatory criterion of obtaining a Florida teaching certification within 18 months of being promoted and that he lacked the requisite two years of Training Instructor experience.

Hiring a less qualified person can support an inference of discriminatory motivation. *See Alexander v. Fulton County,* 207 F.3d 1303, 1340 (11th Cir.2000) ("both the Supreme Court and this court have observed that evidence showing an employer hired a less qualified applicant over the plaintiff may be probative of whether the employer's proffered reason for not promoting plaintiff was pretextual"); *Walker v. Mortham,* 158 F.3d 1177, 1190 (11th Cir.1998) ("The fact that a court may think that the employer misjudged the qualifications of the applicants does not in itself expose him to Title VII liability, although this may be probative of whether the employer's reasons are pretexts for discrimination." (internal marks, emphasis and citation omitted)). Here, the fact that the Division promoted Preston, an employee who was unqualified under the Division's criteria, over Bass supports an inference of discrimination. This inference is further strengthened by Chief Moody's statement that the County would continue to promote based on race and by other circumstantial evidence of discrimination.

### d. Deviation from Standard Procedure

In support of his fourth pretext argument, Bass presented evidence indicating that the Fire and Rescue Division departed from its standard procedure when it interviewed the applicants for the Training Instructor

positions. Tom Preston, who developed the interview process for the Training Instructor and Group Supervisor positions, testified that interview scores were not intended to be determinative, and the interview policy specifically stated that scores were not to be totaled and that the interview was only one component to be considered. The policy, which was identified in deposition by Valle, included the following instructions:

> NOTE: Do not total scores. This process is intended to develop a profile, highlighting a candidate's areas of strength and weakness. This process was designed as one component to be used in conjunction with other criteria to determine a final selection.

The Division violated these written procedures by totaling the scores and relying exclusively upon the interviews. An employer's violation of its own normal hiring procedure may be evidence of pretext. *See Hill v. Seaboard Coast Line R.R.,* 885 F.2d 804, 811 (11th Cir.1989). We believe that this is especially true where, as here, an employer disregards all but one of the factors and qualifications generally taken into consideration and relies solely on a factor which was designed to create "leeway" for the promotion of people of a certain race.

Furthermore, other facts surrounding the interview process used in selecting the Training Instructors indicate that the process was suspect. For example, the interviewers, who were the sole decisionmakers, received no training or guidelines to help them evaluate which candidates were best qualified for the Training Instructor positions. The interviewers were supposed to evaluate the applicants' responses to certain situations to determine which candidates would make the best Training Instructors, yet the interviewers were never even informed of what duties a Training Instructor had. Although Middleton testified that he had at some time received training in the interview process itself, he said he received no training with respect to the specific qualifications to look for when interviewing the Training Instructor applicants. Valle, another member of the Training Instructor interview panel, testified that he knew very little about firefighter training at the time he served on the panel. Meeks, the final member of the Training Instructor interview panel, testified that she had no knowledge of firefighting or training when she served on the panel. Furthermore, despite the fact that the panel members were called upon to judge the applicants' qualifications to be Training Instructors, Middleton, who chose the other two panel members, testified that he "[t]ried to select people who had little or no involvement with the training function."

We recognize that "a defendant may terminate an employee for a good or bad reason without violating federal law" and "[w]e are not in the business of adjudging whether employment decisions are

prudent or fair." *Damon v. Fleming Supermarkets of Florida, Inc.,* 196 F.3d 1354, 1361 (11th Cir.1999). We are, however, in the business of adjudging whether an employer violated Title VII by improperly making employment decisions based on race. In this case, the selection process employed by the Division, when viewed in light of the other evidence of the County's race-conscious hiring and promotion efforts, constituted circumstantial evidence that the Division was acting with race in mind while selecting Training Instructors, and that is so even without any consideration of the County's formal affirmative action plans.

### e. The County's Affirmative Action Plans

The last category of evidence that the proffered interview reason was pretext is the County's affirmative action plans, which were in effect at the time that the Fire and Rescue Division refused Bass a Training Instructor position. As we will explain in the next section, we think the County's affirmative action plans—unless those plans are valid—are actually direct evidence of unlawful discrimination.

### f. Conclusion

We conclude that the evidence offered by Bass was more than sufficient to raise a genuine issue of material fact about whether the County's articulated nondiscriminatory reason for not hiring him was pretextual. The county officials' emphasis on promoting employees based upon race, the statement by Chief Moody concerning race-conscious efforts, the Division's deviation from procedures, the hiring of an unqualified candidate instead of Bass, who was qualified, provide more than enough evidence for a reasonable jury to conclude that the County's proffered non-discriminatory explanation for its actions was pretextual. The district court erred when it granted summary judgment in favor of the County on Bass' race discrimination claims under Title VII, § 1981 and the Florida Civil Rights Act.[4]

### 4. *Direct Evidence Supporting the Title VII Claim*

We now turn to the consideration of the County's affirmative action plans as direct evidence of discrimination supporting Bass' Title VII, § 1981 and Florida Civil Rights Act claims. The affirmative action issues in this case arise in a somewhat unusual posture. In a typical Title VII case involving an affirmative

---

[4]Although Bass has presented no separate arguments in support of his claims under the Florida Civil Rights Act, we have recognized that "decisions construing Title VII are applicable when considering claims under the Florida Civil Rights Act...." *Harper v. Blockbuster Entertainment Corp.,* 139 F.3d 1385, 1387 (11th Cir.1998). Likewise, "[t]he elements of a claim of race discrimination under 42 U.S.C. § 1981 are also the same as a Title VII disparate treatment claim in the employment context." *Rice-Lamar v. City of Fort Lauderdale,* 232 F.3d 836, 843 n. 11 (11th Cir.2000). Therefore, for the same reasons that we reverse the grant of summary judgement as to Bass' Title VII race discrimination claim, we also reverse as to his race discrimination claims brought under the Florida Civil Rights Act and § 1981.

action plan, an employer asserts in response to a plaintiff's prima facie showing of discrimination that its employment decision was made pursuant to an affirmative action plan and that its compliance with such a plan was a legitimate, nondiscriminatory reason for its actions. *See, e.g., Johnson v. Transportation Agency, Santa Clara County, Calif.,* 480 U.S. 616, 626-27, 107 S.Ct. 1442, 1449, 94 L.Ed.2d 615 (1987). The question in those circumstances is whether the employer's affirmative action plan is valid.

In this case, the County has sought no cover from its affirmative action plans (and, in fact, seems to distance itself from them), and it is Bass who relies on the County's affirmative action plans in support of his claims. Of course, a defendant who in fact acts pursuant to an affirmative action plan cannot avoid judicial review of the plan by disavowing reliance upon it, where there is evidence that the plan played a part in the employment decision.

The first step in ascertaining whether the County can be held liable for discrimination as a result of its affirmative action plans is a determination of whether there is sufficient evidence that it acted pursuant to those plans. The mere existence of an affirmative action plan by itself does not constitute direct evidence of discrimination unless there is also evidence that the employer acted pursuant to the plan in making employment decisions. *See Brown v. McLean,* 159 F.3d 898, 904 (4th Cir.1998) (holding that affirmative action plan is only relevant if defendant acted pursuant to plan); *Cerrato v. San Francisco Community College Dist.,* 26 F.3d 968, 976 (9th Cir.1994) (same); *McQuillen v. Wisconsin Educ. Ass'n Council,* 830 F.2d 659, 666 (7th Cir.1987) (same).

However, the existence of an affirmative action plan, when combined with evidence that the plan was followed in an employment decision, is sufficient to constitute direct evidence of unlawful discrimination unless the plan is valid. *See McGarry v. Board of County Comm'rs of Pitkin,* 175 F.3d 1193, 1200 (10th Cir.1999) (holding that county personnel director's statements that those hired were not better qualified than white applicant and that those hirings were minority affirmative action hirings, made against the backdrop of the county's policy statements regarding hiring and affirmative action, constituted direct evidence of discrimination). Furthermore, even when a defendant denies having acted pursuant to its affirmative action plan, if there is evidence that it may have done so, a jury must decide whether the defendant in fact acted pursuant to its stated plan. *See Messer v. Meno,* 130 F.3d 130, 139 (5th Cir.1997) (finding that jury could conclude that defendant acted pursuant to affirmative action plan in light of circumstantial evidence even though defendant denied having taken plan into account). When a jury finds that a government employer

acted pursuant to an affirmative action plan, then the employer should be held liable for discrimination unless the plan is valid under Title VII and the Equal Protection Clause.[5] This is because, regardless of good intentions, a government employer commits unlawful discrimination when it takes race into account in an employment decision and acts pursuant to an invalid affirmative action plan.[6]

### a. Meaning of "Direct Evidence" in Context of Discrimination Claim

For the reasons that follow, we hold that where there is an invalid affirmative action plan in effect relating to the employer's allegedly discriminatory actions, that plan constitutes direct evidence of discrimination if there is sufficient circumstantial evidence to permit a jury reasonably to conclude the employer acted pursuant to the plan when it took the employment actions in question.

Because we believe that the term has been a source of confusion, we begin by discussing the meaning of "direct evidence" in the context of a Title VII race discrimination claim. First, we note that the phrase "direct evidence," when used in the context of discrimination claims, does not refer to whether evidence is direct or circumstantial in the ordinary evidentiary sense in which we normally think of those terms. Instead, "direct evidence" refers to a type of evidence which, if true, would require no inferential leap in order for a court to find discrimination. We do not believe that the status of evidence as "direct" in this context, however, changes simply because a defendant contests the validity of the evidence, thereby requiring the plaintiff to offer proof related to the disputed evidence through other means. Therefore, an affirmative action plan may constitute direct evidence, even when a defendant denies having acted pursuant to its stated

---

[5] Under 42 U.S.C. § 2000e-5(g)(2)(B), adopted as part of the Civil Rights Act of 1991, a defendant may, however, limit the types of relief to which a Title VII plaintiff is entitled if it is able to "prove by a preponderance of the evidence that it would have made the same disputed employment decision even in the absence of the alleged discrimination." *Lewis v. Young Men's Christian Assoc.,* 208 F.3d 1303, 1304 (11th Cir.2000). *See also Canup v. Chipman-Union, Inc.,* 123 F.3d 1440, 1441-42 (11th Cir.1997) (discussing impact of the 1991 amendments to the Civil Rights Act on cases in which defendant attempts to show that it would have made same decision even without discrimination).

[6] In another case recently before this Court, a plaintiff in a race discrimination lawsuit sought summary judgment as to the employer's liability based on its undisputed compliance with its affirmative action plan. *See Thigpen v. Bibb County, Sheriff's Dep't,* 223 F.3d 1231, 1244 (11th Cir.2000). Although we did not rule out that such a finding of liability might be appropriate in some cases, we noted that an affirmative action plan "does not necessarily offend the equal protection clause," and remanded that case for a determination of whether the affirmative action plan passed muster under strict scrutiny analysis. *Id.* Our analysis in *Thigpen* leaves open the possibility, however, that summary judgment as to liability for discrimination might be appropriate where there is no dispute over whether a defendant was acting pursuant to an affirmative action plan, if a district court determines that the affirmative action plan is invalid under Title VII and the Equal Protection Clause.

plan.[7]

This view of direct evidence is supported by this Court's case law addressing other types of direct evidence. We have held that "[w]here the non-movant presents direct evidence that, *if believed by the jury,* would be sufficient to win at trial, summary judgment is not appropriate *even where the movant presents conflicting evidence.*" *Mize v. Jefferson City Bd. of Educ.,* 93 F.3d 739, 742 (11th Cir.1996) (emphasis added). Furthermore, "[w]e have defined direct evidence as 'evidence, *which if believed,* proves the existence of fact in issue without inference or presumption.' " *Merritt v. Dillard Paper Co.,* 120 F.3d 1181, 1189 (11th Cir.1997) (quoting *Rollins v. TechSouth, Inc.,* 833 F.2d 1525, 1528 n. 6 (11th Cir.1987)) (emphasis added). The factual premise of "direct evidence" of discrimination may be disputed, and it may well be that a plaintiff will have to establish the "direct evidence" by introducing circumstantial evidence.

---

[7]The County argues that affirmative action plans should be considered circumstantial, instead of direct, evidence. It points out that *Johnson* applied the *McDonnell Douglas* burden-shifting framework in assessing an affirmative action plan, *Johnson,* 480 U.S. at 626, 107 S.Ct. at 1449, and some of our decisions have held that with direct evidence "it is incorrect to rely on the *McDonnell Douglas* test because, while circumstantial evidence is used to create an inference of discrimination under *McDonnell Douglas,* no such inference is required in the case of direct evidence." *See, e.g., Taylor v. Runyon,* 175 F.3d 861, 867 n. 2 (11th Cir.1999). The County reasons that because the *McDonnell Douglas* framework does not apply to direct evidence claims, and the Supreme Court applied that framework to an affirmative-action-based claim in *Johnson,* it necessarily follows that affirmative action plans cannot be direct evidence. Although this syllogism has some superficial appeal, we believe it ultimately fails.

To begin with, we note that the Supreme Court never said in *Johnson* that affirmative action plans should be treated as circumstantial evidence. In fact, the word "circumstantial" never appears in that opinion. Instead, the Court simply concluded that the *McDonnell Douglas* framework was useful in light of the assignment of the various burdens relevant to the claim. *See Johnson,* 480 U.S. at 626, 107 S.Ct. at 1449 (" This case also fits readily within the analytical framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Once a plaintiff establishes a prima facie case that race or sex has been taken into account in an employer's employment decision, the burden shifts to the employer to articulate a nondiscriminatory rationale for its decision. The existence of an affirmative action plan provides such a rationale. If such a plan is articulated as the basis for the employer's decision, the burden shifts to the [Title VII] plaintiff to prove that the employer's justification is pretextual and the plan is invalid."). Nothing in *Johnson* means that the plaintiff is not entitled to prevail without further adieu if the affirmative action plan the employer asserts as the motivation for its actions is invalid.

As we explain below, treating affirmative action plans as direct evidence is consistent with our other decisions relating to direct evidence. Statements by decisionmakers clearly evincing discriminatory intent and obviating the need to rely on an inference of discrimination constitute direct evidence of discrimination. *See, e.g., Merritt v. Dillard Paper Co.,* 120 F.3d 1181, 1189 (11th Cir.1997). In principle, an affirmative action plan is exactly such a statement. The only thing to distinguish an affirmative action plan from any other discriminatory statement (other than the degree of formality involved) is that the discrimination it describes or prescribes is permissible if the plan is valid under Title VII and the Equal Protection Clause. If it is not valid, an affirmative action plan amounts to nothing more than a formal policy of unlawful discrimination.

For example, in *Merritt,* we considered whether an alleged statement by an employer constituted direct evidence in support of the plaintiff's retaliation claim. *Merritt,* 120 F.3d at 1189-91. In that case, the employer denied that a decisionmaker had made a statement which, if true, clearly showed a retaliatory motive behind the termination of the plaintiff's employment. *Id.* Nonetheless, we concluded that because a jury could find that the decisionmaker had made the statement, there was direct evidence of retaliation precluding summary judgment. *Id.* Given this approach, we hold, for the following reasons, Bass has put forth enough evidence of the existence of direct evidence of discrimination in the form of the County's affirmative action plans that a jury could find the Division acted pursuant to those plans.

*b. The County's Affirmative Action Plans*

We begin with the facts concerning the County's affirmative action plans. All parties agree that the County had affirmative action plans in place at the time of the Fire and Rescue Division's reorganization, and that those plans were applicable to the Division. Bass showed that in November 1990, the Board of County Commissioners adopted a five-year affirmative action plan. The plan stated that the underutilization of blacks and Hispanics at the Division existed "division wide." It set county-wide goals for the hiring of minorities and instructed division directors and department managers to establish annual numerical hiring and promotion objectives to alleviate the underutilization of women and minorities.

Bass also presented evidence that in July 1993, the County adopted another plan, the 1993 Diversification Plan, "to ensure that Orange County's workplace is devoid of discrimination and is generally reflective of the County's diverse population." The 1993 Diversification Plan required county departments and divisions to suspend the hiring process when no qualified minority or female applicant was available and "provide written justification to the EEO/Professional Standards Department stating job related reasons why diversity cannot be obtained via the particular hiring process." The 1993 Diversification Plan also set percentage hiring goals in positions that were found to have few minorities or women. That 1993 plan was in effect during the time Bass interviewed for the Training Instructor position in October 1995, and it covered hiring at the Fire and Rescue Division. In its response to Bass' EEOC charge, the County acknowledged the existence of an affirmative action plan covering the Division and stated that one of the paramount objectives of the plan was to "increase the percentage of women and minorities in job categories where they have been traditionally underrepresented."

Although the County clearly had affirmative action plans in place during the 1995 reorganization,

it contends based on testimony from the interview panel members, that the decision not to offer the Training Instructor position to Bass was unrelated to its affirmative action plans. To support this contention, the County points to testimony from the panel members indicating that the Training Instructors were selected solely on the basis of their interview scores and that no other factors, such as race, were taken into consideration. Valle specifically testified that there was no discussion of race at anytime. Furthermore, the County notes that the three Training Instructors selected represented the top three interview scores of the applicants who were still in consideration.

Although the parties dispute whether the Fire and Rescue Division was acting pursuant to the County's affirmative action plans, we must bear in mind that this case is before us at the summary judgment stage. This means the County is entitled to judgment at this time only if it shows "that there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). Moreover, Bass, as the non-movant, is entitled to have all reasonable inferences from the evidence in the record drawn in his favor. *Ryder Int'l Corp. v. First American Nat'l Bank,* 943 F.2d 1521, 1523 (11th Cir.1991).

There is substantial circumstantial evidence in the record upon which a jury reasonably could conclude that the Division acted pursuant to the County's affirmative action plans. We have outlined above various types of circumstantial evidence which, independent of the County's affirmative action plans, permit Bass' Title VII claim to go to a jury. That same evidence would permit a reasonable jury to conclude that, despite its denials, the Division was acting pursuant to the County's affirmative action plans when it decided to deny Bass a Training Instructor position during the 1995 reorganization. While the mere existence of an affirmative action plan does not constitute direct evidence of discrimination, the existence of a plan combined with other circumstances of the type present in this case make available to a jury the reasonable inference that the employer was acting pursuant to the plan despite statements to the contrary from the decisionmakers involved. Therefore, given the undisputed fact that the County had affirmative action plans which were in effect at the time of the actions that are the subject of this lawsuit, and given the evidence (all of which is circumstantial and some of which is disputed) that the Division acted pursuant to those affirmative action plans, there is direct evidence of discrimination.

### c. The Validity of the County's Affirmative Action Plans

If it is either proven or conceded that a defendant acted pursuant to an affirmative action plan, the question then becomes whether the plan is valid under Title VII. The validity of an affirmative action plan

is judged under the following test:

> We must first determine whether the [government employer's] consideration of the race of promotional candidates was justified by a manifest racial imbalance that reflected under-representation of [the affirmative action plan's beneficiaries] in traditionally segregated job categories.... If such a justification was present when the plan was developed, we must then determine whether the plan itself provides a proper remedy for that imbalance. A remedy is proper if the plan does not unnecessarily trammel the rights of non-black employees or create an absolute bar to their advancement.

*In re Birmingham Reverse Discrimination Employment Litig.,* 20 F.3d 1525, 1537 (11th Cir.1994) (citing *Johnson,* 480 U.S. at 632, 637, 107 S.Ct. at 1452, 1455).

In *Johnson,* the Supreme Court held that the burden of showing that an affirmative action plan is invalid is on the plaintiff in a Title VII case. *See Johnson,* 480 U.S. at 626-27, 107 S.Ct. at 1449 ("As a practical matter, of course, an employer will generally seek to avoid [a finding of invalidity] by presenting evidence in support of its plan. That does not mean, however, as petitioner suggests, that reliance on an affirmative action plan is to be treated as an affirmative defense requiring the employer to carry the burden of proving the validity of the plan. The burden of proving its invalidity remains on the plaintiff.").

In reaching this decision, the Supreme Court cited only one reason for placing the burden of proving the invalidity of an affirmative action plan on a Title VII plaintiff—that it had placed a similar burden on plaintiffs in the equal protection context. *See* 480 U.S. at 626, 107 S.Ct. at 1449 ("Only last Term, in *Wygant v. Jackson Board of Education,* 476 U.S. 267, 277-278, 106 S.Ct. 1842, 1849, 90 L.Ed.2d 260 (1986), we held that '[t]he ultimate burden remains with the employees to demonstrate the unconstitutionality of an affirmative-action program,' and we see no basis for a different rule regarding a plan's alleged violation of Title VII.").

In the fifteen years following the *Johnson* decision, much has changed in this area of the law and the change casts considerable doubt over the viability of *Johnson* 's holding concerning who has the burden with respect to the validity of an affirmative action plan. As the County concedes, and as we will discuss more later, the law now is that insofar as an equal protection claim is concerned the defendant must prove that its affirmative action plan satisfies strict scrutiny. *See, e.g., City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 510-11, 109 S.Ct. 706, 730-31, 102 L.Ed.2d 854 (1989) (concluding that city had failed to demonstrate that the plan was supported by a strong basis in evidence and had "failed to identify the need for remedial action"). Because consistency in treatment of equal protection and Title VII claims was the only reason given in *Johnson* for placing the burden as to the validity of the plan on a Title VII plaintiff, it is likely that the

Supreme Court would place the burden on the defendant if it reconsidered the issue today. *See generally Hill v. Ross,* 183 F.3d 586, 590 (7th Cir.1999) (noting that *Johnson* was undermined by subsequent decisions, but declining to decide whether it survived those decisions).

If it were up to us, we would follow the reasoning about consistency in *Johnson* and assign the burden regarding the validity of an affirmative action plan to the same party in both the Title VII and equal protection contexts. As a practical matter, placing the burden on different parties for purposes of Title VII and equal protection claims is problematic, especially in cases, such as this one, where there are both Title VII and equal protection claims aimed at an affirmative action plan. Placing the burden regarding the validity of the plan on the plaintiff as to one claim and on the defendant as to the other may cause confusion and creates the real possibility of disparate results as to the two claims in the same case involving the same plan. Where the evidence is in equipoise, or in the more likely event that there is a failure of evidence on a factor in the analysis, the same plan could be judged valid for Title VII purposes but invalid for equal protection purposes. The possibility of such an incongruous result would be avoided if the burdens were placed on the same party for purposes of both types of claims.

Failing to place the burden of showing that an affirmative action plan is valid on a Title VII defendant is also contrary to the trend since *Johnson* towards heightened, rather than relaxed, scrutiny of affirmative action plans. *See, e.g., Croson,* 488 U.S. at 510-11, 109 S.Ct. at 730-31; *Adarand,* 515 U.S. at 227, 115 S.Ct. at 2113. *Cf.* Bob Dylan, *Subterranean Homesick Blues, on Bringing it All Back Home* (Columbia 1965) ("You don't need a weatherman to know which way the wind blows.").

Nonetheless, we take to heart the Constitution's description of us as one of the "inferior Courts," Art. III, § 1, and try to follow scrupulously Supreme Court holdings. On numerous occasions, the Supreme Court has reminded us that it is its "prerogative alone to overrule one of its precedents." *United States v. Hatter,* --- U.S. ----, 121 S.Ct. 1782, 1790, --- L.Ed.2d ---- (2001) (citations and quotations omitted). When faced with similar circumstances in which it appeared that a Supreme Court precedent had been undermined by subsequent Supreme Court decisions, we recently reasoned:

> Given the severity of the blows *O'Malley* and *Will* inflicted upon *Evans* one might suggest it is time to recognize that *Evans* is dead and gone. The problem is that the Supreme Court has insisted on reserving to itself the task of burying its own decisions. We have been told more than once by it that "[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court, the prerogative of overruling its own decisions."

*Jefferson County v. Acker,* 210 F.3d 1317, 1320 (11th Cir.2000) (quoting *Rodriguez de Quijas v.*

*Shearson/American Express, Inc.,* 490 U.S. 477, 484, 109 S.Ct. 1917, 1921-22, 104 L.Ed.2d 526 (1997)) (citation omitted). Accordingly, we recognized in *Acker* our inability to inter a Supreme Court decision no matter how wounded it might appear to be in light of subsequent decisions.[8] Thus, "[w]here a Supreme Court decision that has not been overruled is squarely on point and therefore 'directly controls' the case at hand, we are to follow it even though convinced that the Court will overturn that decision the next time it addresses the issue." *Id.* What this means is unless or until the Supreme Court revisits its holding in *Johnson,* it is the plaintiff in an affirmative-action-based, race discrimination case who bears the burden of showing that a plan is invalid under Title VII. On remand, in addition to shouldering the burden of proving that the County acted pursuant to its affirmative action plans, Bass also must show that the County's affirmative action plans were invalid in order to hold the County liable under Title VII for acting pursuant to those plans.

### 5. *Bass' Equal Protection Claim*

Next, we consider whether Bass' § 1983 claim alleging an equal protection violation should be permitted to go to a jury. As we have explained, Bass has put forth sufficient evidence in support of his Title VII claim for a reasonable jury to find that the Division acted pursuant to the County's affirmative action plans in failing to offer him a Training Instructor position. We believe, based on the same evidence, that is also true for his § 1983 claim.

As with Title VII, the question then becomes whether the County's affirmative tection Clause to the Constitution. The Supreme Court has held that "all racial classifications, imposed by whatever federal, state, or local government actor, must be analyzed by a reviewing court under strict scrutiny." *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 227, 115 S.Ct. 2097, 2113, 132 L.Ed.2d 158 (1995); *see also City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 493-94, 109 S.Ct. 706, 721-22, 102 L.Ed.2d 854 (1989). Strict scrutiny review requires the racial classification to serve a compelling governmental interest and be narrowly tailored to achieve that interest. *See Adarand,* 515 U.S. at 227, 115 S.Ct. at 2113. "[A] free people whose institutions are founded upon the doctrine of equality should tolerate no retreat from the principle that government may treat people differently because of their race only for the most compelling reasons." *Id.* (citation and internal marks omitted). Therefore, actions pursuant to an affirmative action plan which does not satisfy strict scrutiny constitute unlawful and unconstitutional discrimination. *See, e.g., Adarand,* 515

---

[8]The Supreme Court recently did inter the *Evans* decision, which we spoke of in *Acker,* explicitly overruling its prior holding in *Evans. See Hatter,* 121 S.Ct. at 1793.

U.S. at 227, 115 S.Ct. at 2113.

The County concedes that, in contrast to the Title VII context, Supreme Court precedent governing equal protection claims places the burden on a defendant to prove that an affirmative action plan satisfies strict scrutiny. Up to this point, the County has never argued, even in the alternative, that its affirmative action plans are up to this equal protection challenge, and we do not know if it will ever do so. So, it would be premature for us to decide whether the County has waived the right to argue that. If, on remand, the County raises this issue, it will be for the district court to decide in the first instance whether that argument is still available to the County given its strategy so far of denying that its plans played any role in the challenged employment actions, or whether because of the County's previous litigating position it is now precluded from asserting that the plans are valid under the Equal Protection Clause.

Furthermore, if the district court permits the County to assert on remand that its affirmative action plans are valid under the Equal Protection Clause, the court will then need to decide whether to take up the legal issue about the validity of the plans before or after the jury considers the factual issue of whether the County acted pursuant to its plans. In complicated affirmative action cases like this one involving multiple burdens assigned to different parties and requiring determinations by both judge (i.e. validity of a plan) and jury (i.e. whether defendant acted pursuant to a plan), we believe that it is best to allow a district court to decide, based on the circumstances of the particular case, the timing and order of the proceedings. Therefore, if the County contends (for the first time) on remand that its affirmative action plans are valid under the Equal Protection Clause, the district court can decide how and when to decide the issues related to that contention.[9]

## B. RETALIATION CLAIMS

In addition to prohibiting employers from discriminating on the basis of race, Title VII makes it unlawful:

> for an employer to discriminate against any of his employees or applicants for employment, ... because he has opposed any practice made an unlawful employment practice by this subchapter [of Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter [of Title VII].

42 U.S.C. § 2000e-3(a). In order to establish a prima facie case of retaliation, the plaintiff must show: (1)

---

[9]Regardless of whether the County has waived the right to assert the validity of its plans for equal protection purposes, it has not done so for Title VII purposes because the burden on that issue is on the Title VII plaintiff. If Bass does not carry his burden of showing the plans are invalid, his Title VII claim must fail, insofar as it is based on the existence of the plans as distinguished from the other evidence of discrimination.

he engaged in protected activity; (2) he suffered an adverse employment action; and (3) there was a causal link between his protected activity and the adverse employment action. *See Gupta v. Florida Bd. of Regents,* 212 F.3d 571, 587 (11th Cir.2000); *Farley v. Nationwide Mut. Ins.,* 197 F.3d 1322, 1336 (11th Cir.1999); *Little v. United Technologies,* 103 F.3d 956, 959 (11th Cir.1997).

The district court assumed that Bass had established a prima facie case of retaliation, although it stated that Bass had "difficulty satisfying the third prong of the prima facie test," the causal link. The court then held that the County had articulated legitimate non-retaliatory reasons for its action which Bass failed to rebut, and as a result the County was entitled to summary judgment on the retaliation claims. Bass argues that he established a prima facie case and the district court erred in holding that he had failed to present sufficient evidence to create a jury issue about the County's proffered reason.

We will first address Bass' prima facie case. Bass contends that he engaged in a protected activity by filing a union grievance in October 1995 in which he complained of racial discrimination in the hiring of the Training Instructors and by filing a charge of discrimination with the EEOC in December 1995. We need not decide whether the filing of the union grievance was a protected activity for anti-retaliation purposes, because the filing of the EEOC complaint clearly was, and the bulk of the allegedly retaliatory actions occurred after the filing of the EEOC complaint. *See Berman v. Orkin Exterminating Co.,* 160 F.3d 697, 702 (11th Cir.1998) (holding that filing of EEOC complaint is protected activity). Bass thus satisfied the first prong of the prima facie case of retaliation.

With respect to the second prong, Bass alleges that he suffered numerous adverse employment actions. Bass presented evidence that the following actions were taken against him after he filed his complaints the EEOC: (1) he had no routine work assignments; (2) he was forced to perform custodial and clerical duties, and usually was supervised by less senior personnel; (3) he was continuously denied the opportunity to earn overtime pay, on-call pay, riding-out-of classification pay, and adjunct teaching pay, which were available to other training instructors; (4) he was transferred out of the Training Bureau in January 1997 and was not informed of his new position until April 1997; and in April 1997, he was told to report to work in a non-budgeted position that was not covered by the union contract; (5) he was ordered to take tests to retain his paramedic pay while other Training Instructors were not required to do so; (6) Chief Smith and Middleton ordered him not to record in his work logs the custodial and clerical work he performed; and (7) Bass' training programs, database files for documenting training, and graphic/multimedia material he

had developed over a five-year period were destroyed.

"An adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." *Gupta,* 212 F.3d at 587 (citation and marks omitted). "Conduct that falls short of an ultimate employment decision must meet 'some threshold level of substantiality ... to be cognizable under the anti-retaliation clause' " of Title VII. *Id.* (quoting *Wideman v. Wal-Mart Stores, Inc.,* 141 F.3d 1453, 1456 (11th Cir.1998)). While "not everything that makes an employee unhappy is an actionable adverse action," *Smart v. Ball State Univ.,* 89 F.3d 437, 441 (7th Cir.1996), conduct that alters an employee's compensation, terms, conditions, or privileges of employment does constitute an adverse action under Title VII. *See Graham v. State Farm Mut. Ins. Co.,* 193 F.3d 1274, 1283 (11th Cir.1999); *Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1300 (3d Cir.1997). The question of whether an employee has suffered a materially adverse employment action will normally depend on the facts of each individual case. *See Gupta,* 212 F.3d at 587.

The last two listed actions of which Bass complains—the order not to record custodial work in his work log and the destruction of various materials—are not adverse employment actions. Those actions were not objectively "serious and tangible enough" to alter Bass' "compensation, terms, conditions, or privileges of employment, deprive[ ] ... him of employment opportunities or adversely affect ... his status as an employee." *Robinson,* 120 F.3d at 1300 (internal marks omitted). We do not see how being told not to record certain tasks on a work log could constitute a serious alteration of the terms of Bass' employment. Also, the Division's disposal of training programs, database files for documenting training, and graphic/multimedia material prepared by Bass in no way punished or affected Bass' employment status.

Having explained why the last two of the seven actions about which Bass complains were not adverse employment actions, we turn now to the remaining five. It is undisputed that Bass was not given the same duties as the other Training Instructors. Bass was given no routine work assignments and was forced to perform custodial and clerical duties under the supervision of less senior personnel. The Division also denied him the opportunity to earn overtime pay, on-call pay, riding-out-of classification pay, and adjunct teaching pay, which were available to other Training Instructors. Prior to filing his EEOC complaint alleging racial discrimination, Bass had been permitted to teach adjunct courses and receive pay from agencies other than the Division. After filing that complaint, he was not allowed to do so. In addition, Bass was ordered

to take tests to maintain his paramedic pay while none of the other Training Instructors were required to do so.

We conclude that the Division's actions which deprived Bass of compensation which he otherwise would have earned clearly constitute adverse employment actions for purposes of Title VII. *See McCabe v. Sharrett,* 12 F.3d 1558, 1564 (11th Cir.1994) (holding that employee suffered adverse job action where she had fewer responsibilities, was made to perform more menial tasks, and had lesser opportunity for salary increases in her new position). While the other actions might not have individually risen to the level of adverse employment action under Title VII, when those actions are considered collectively, the total weight of them does constitute an adverse employment action. *See Wideman v. Wal-Mart Stores, Inc.,* 141 F.3d 1453, 1456 (11th Cir.1998) ("It is enough to conclude, as we do, that the actions about which Wideman complains considered collectively are sufficient to constitute prohibited discrimination. We need not and do not decide whether anything less than the totality of the alleged reprisals would be sufficient.").

That brings us to the question of whether there is enough evidence to create a genuine issue of material fact as to the causal connection between Bass' participation in a protected activity and the adverse employment actions. "To establish a causal connection, a plaintiff must show that the decisionmakers were aware of the protected conduct, and that the protected activity and the adverse action were not wholly unrelated." *Gupta,* 212 F.3d at 590 (citation and internal marks omitted); *see also Raney v. Vinson Guard Service, Inc.,* 120 F.3d 1192, 1197 (11th Cir.1997) ("a plaintiff must, at a minimum, generally establish that the defendant was actually aware of the protected expression at the time the defendant took the adverse employment action"). It is not enough for the plaintiff to show that someone in the organization knew of the protected expression; instead, the plaintiff must show that the person taking the adverse action was aware of the protected expression. *See Raney,* 120 F.3d at 1196. This awareness, however, may be established by circumstantial evidence. *See Goldsmith v. City of Atmore,* 996 F.2d 1155, 1163 (11th Cir.1993). Close temporal proximity between the protected activity and the adverse action may be sufficient to show that the two were not wholly unrelated. *See Gupta,* 212 F.3d at 590.

Bass filed his EEOC charge on December 19, 1995. Soon after Bass filed his EEOC complaint, he began to suffer adverse employment actions. The close temporal proximity between filing of the EEOC complaint and the adverse actions is sufficient in this case to satisfy the third prong of the prima facie case of retaliation. *See generally Gupta,* 212 F.3d at 590. Thus, Bass established a prima facie case of

discrimination.

The burden then shifts to the County to set forth a legitimate, non-retaliatory reason for its actions. The Fire and Rescue Division's only reason for not assigning Bass Training Instructor duties was that there was no vacant district to which to assign him. The County contends that the head of the Training Bureau, Chief Willard Smith, decided to keep three districts, instead of creating a fourth. It also maintains that Smith decided that only one Training Instructor should serve each district.

Bass argues that the County's articulated reason is insufficient because it addresses only the failure to assign Bass Training Instructor duties and not the other alleged retaliatory actions such as being placed in a non-union job and not being allowed overtime pay. Bass further argues that he has shown that the County's one-instructor-per-district defense is pretext because the Fire and Rescue Division failed to place Bass in the Training Instructor position that became vacant in the spring of 1998 and was still vacant as of November 1998. Middleton confirmed the existence of the vacancy.

We agree that the County failed to negate the existence of a genuine issue of material fact concerning a causal connection between all of the adverse actions and Bass' filing of the EEOC complaint. The County only addressed one part of the retaliation: the failure to assign Training Instructor duties to Bass. While the "no vacant district" argument may explain his lack of Training Instructor duties and thus the imposition of clerical duties, it does not explain other adverse employment actions such as Bass' transfer to a non-union job, his being denied the opportunity to teach outside courses, and the testing requirement placed on Bass and not others. The County does not attempt to explain those other actions, nor does it explain why Bass was not assigned to the Training Instructor position that became available in the spring of 1998. The district court thus erred in granting the County's motion for summary judgment.[10]

## IV. CONCLUSION

We hold that the district court erred in granting summary judgment to the County on Bass' Title VII,

---

[10]Although Bass presented no separate arguments in support of his claims under the Florida Civil Rights Act, for the same reasons that we reverse the grant of summary judgement as to Bass' retaliation claim under Title VII, we also reverse as to his parallel claim under the Florida Civil Rights Act. *See supra* n. 4.

      With respect to Bass' § 1981 retaliation claim, the situation is less clear. We have previously noted that whether the elements of Title VII and § 1981 retaliation claims are the same is an "open question" in this Circuit. *See Olmsted v. Taco Bell Corp.,* 141 F.3d 1457, 1463 n. 4 (11th Cir.1998). However, the parties have not raised or argued that issue before us, so we will not attempt to decide it now. If the issue is raised and preserved on remand and survives the jury trial, it can be addressed in any subsequent appeal.

§ 1981, and Florida Civil Rights Act race discrimination and retaliation claims, and on his § 1983 equal protection claim. Accordingly, we REVERSE the district court's grant of summary judgment to the County and REMAND for further proceedings in accordance with this opinion.

REVERSED and REMANDED.